## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
SIMSBURY-AVON PRESERVATION        :
SOCIETY, LLC, et al.,             :
     Plaintiffs,                  :
                                  :   Civil No. 3:04cv803(JBA)
v.                                :
                                  :
METACON GUN CLUB, INC.,           :
     Defendants.                  :
```

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### AND MOTION TO STRIKE [DOCS. # 32, 38]

Plaintiffs Simsbury-Avon Preservation Society, LLC ("SAPS"), and individual members bring a citizen suit against defendant Metacon Gun Club, Inc. ("Metacon"), alleging violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., as amended, and the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq.  The Court previously dismissed Count Two, a RCRA subchapter III claim, from the complaint.  See Simsbury-Avon Preservation Soc. v. Metacon Gun Club, Inc., Civ. No. 3:04cv803, 2005 WL 1413183 (D. Conn. June 14, 2005) [Doc. # 14].  Defendant now moves for dismissal of the complaint for lack of subject matter jurisdiction, on the grounds that the individual plaintiffs lack standing, as well as for summary judgment on the claims under RCRA subchapter IV (Count One), RCRA subchapter VII (Count Three), and the Clean Water Act's "dump and fill" provisions (Count Five).  Plaintiffs have conceded their CWA "dump and fill" claim,[1] but oppose dismissal of the RCRA claims.

---

[1] See Pl. Mem. of Law [Doc. # 36-2] at 13.

For the following reasons, defendants' motion to dismiss for lack of standing will be denied, but the motion for summary judgment will be granted as to the RCRA claims.

## I.   Factual Background

The summary judgment record reveals the following.  Metacon is a private club that has operated an outdoor shooting range at 106 Nod Road in Simsbury, Connecticut since approximately 1965. It provides firearms training for four local police departments and 650 (according to Metacon) to 750 (according to plaintiffs) private members.  The site is bordered to the north by the Connecticut State Police firing range, to the east by a 650-700 foot cliff that is the boundary of Talcott Mountain State Park, to the south by a golf course and private home, and to the west by Nod Road, the Farmington River, and forested public land. Members shoot toward an earthen berm on the eastern portion of the land, behind which is the cliff and the park.  Between the firing line and the berm is a flat, grassy area known as the range.

It is undisputed that the 137-acre site sits on the floodplain of the Farmington River and contains some wetlands, see Def. L.R. 56(a)1 Stmt. ¶ 2, and plaintiffs argue that the entire site is composed of "wetland soils."  Pl. L.R. 56(a)2 Stmt. ¶ 2.  Metacon's rules prohibit the use of the firing range when rainfall has caused standing water to accumulate on the

range, and they claim that "no shooting at Metacon range is

directed into water," nor does Metacon "discharge ammunition to

any water of any kind."  Affidavit of Gary Lenk, Def. Ex. 11, at

¶ 25.  Plaintiffs argue, however, that bullets are sometimes

fired directly into the ground, and that misdirected bullets

could go over the berm and into wetlands or the park behind the

berm.  Deposition of Rinaldo Tedeschi, Pl. Ex. 2, at 103-104.[2]

The Connecticut Department of Environmental Protection

("DEP") is "unaware of any incident at this range that has

jeopardized the safety of visitors to the Park" from stray

bullets, and opined that there is "no reason to believe that

---

[2]Defendants move to strike [Doc. # 38] several of
plaintiffs' exhibits, including a graph prepared by Mr. Tedeschi,
an engineer, purporting to show that a bullet misdirected by two
degrees could travel above the berm and land on top of the
Talcott Mountain State Park ridge behind.  Pl. Ex. 10. Defendants
also move to strike portions of Tedeschi's deposition, Pl. Ex. 2,
Robert Patricelli's deposition, Pl. Ex. 3, and Gregory Silpe's
Affidavit, Pl. Ex. 4, concerning the direction of water flow on
the Metacon site, as not based on personal observation.  They
also move to strike a 1989 letter from the Simsbury zoning board,
Pl. Ex. 7, as irrelevant because it does not relate to the
presence of lead at Metacon.
     Local Rule 56(a)1 specifically provides that a court will
consider only statements "supported by the evidence."  See also
Giannullo v. City of N. Y., 322 F.3d 139, 142 (2d Cir. 2003).
Accordingly, motions to strike summary judgment evidence are
unnecessary because courts review and rely on only that evidence
that is admissible.  See Radolf v. Univ. of Conn., 364 F. Supp.
2d 204, 230 (D. Conn. 2005); Waananen v. Barry, 343 F. Supp. 2d
161, 172 (D. Conn. 2004); Barlow v. Conn., 319 F. Supp. 2d 250,
259 (D. Conn. 2004).
     Even if a motion to strike were appropriate, the Court
denies defendant's motion as moot because it has not relied on
any of the challenged evidence in ruling on the present motions.

continued operation of the range represents an unreasonable threat to the safety of visitors to Talcott Mountain State Park." Letter from Commr. Rocque to Atty. Gen. Blumenthal, 4/23/04, Def. Ex. 6, at 1.

In 2001, the federal Environmental Protection Agency ("EPA") published guidelines entitled "Best Management Practices for Lead at Outdoor Shooting Ranges."  See Def. Ex. in Support of Mot. for S.J. [Doc. # 30] at Ex. 1.  On July 13, 2004, two months after the complaint was filed in this case, Metacon adopted an "Environmental Stewardship Plan," id. at Ex. 2, that, it claims, implements the EPA's recommended best management practices.  The plan calls for annual lead raking, sifting and clean-up, with the lead to be recycled.  It also calls for biannual pH testing of surface and ground water and soil, to ensure that these measures are within the non-acidic range that slows the breakdown of lead. If soil is found to be too acidic, lime will be applied to neutralize the soil.  Finally, the plan calls for "mining" the berm in the year 2024 to reclaim the lead deposited there and reprocess the soil.  Id.  The parties dispute whether Metacon's plan fully comports with the EPA's recommendations.  Plaintiffs argue that Metacon has not, in the past, engaged in lead bullet reclamation or recycling, but defendant proffers an affidavit from a member who states that he has "been involved in regular clean-ups of the range at the Site" for approximately 10 years,

4

during which efforts the members collect spent casings and bullets and place them in containers, which are picked up "by a lead recycler for recycling." Affidavit of Robert Ronstrom, Def. Ex. 27, at ¶¶ 3-5.

In October 2003, the Connecticut DEP conducted water testing at the Metacon site to determine lead levels in the groundwater and surface water. Drawing water from one deep and three shallow monitoring wells on the property, as well as "a wetland location," the DEP determined that "[e]ach of the samples obtained did exceed Connecticut's Remediation Standard Regulation protection criterion of 0.015 milligrams/liter concentration for the lead parameter in groundwater and surface water." Letter from Thomas O'Connor, Environ. Analyst, to Bob Ronstrom, Pres. of Metacon, 11/19/03, Pl. Ex. 8. However, the DEP noted that the samples were "'grab' type samples" obtained "without first evacuating and/or developing the wells," and thus "some particulate matter was incorporated," which "may have skewed the results...." Id. Accordingly, DEP requested that Metacon retain an engineer to "develop and sample the monitoring wells using an appropriate 'low flow' sampling methodology...." Id.

Metacon retained the environmental engineering firm Leggette, Brashears & Graham, Inc., based in Trumbull, Connecticut, which sampled the wells and surface water on the site on four dates in March 2004. They used the "U.S. EPA Low-

5

Flow Sampling Method" for the well samples.  Report 4/13/04, Def. Ex. 7, at 2.  The firm concluded that "Metacon's long-term shooting activities at the site have not caused environmental harm or an environmental threat to water resources in the surrounding area, as no soluble lead was detected in the water resources at the site."  Id. at 1.  All samples yielded quantities of dissolved lead below the DEP-required level, 0.015 mg/L (not detectable to a reading of 0.013 mg/L).  Id. at Table 1.  However, one of the monitoring wells was measured to have a total lead concentration of 0.018 on March 6, id., which the engineers attributed to possible contamination, id. at 3. Additionally, samples on March 10 and March 15 of an aquifer monitoring well developed by the Simsbury Water Company yielded total lead readings of 0.003 and 0.002 mg/L, respectively, which is above the state regulation maximum level of 0.015, although the dissolved lead was not detectable to a concentration of 0.001 mg/L.  Id. at Table 1.

Advanced Environmental Interface, Inc., ("AEI") an engineering firm based in Middlefield, Connecticut and retained by SAPS, prepared a report dated May 4, 2005, based on samples collected in September 2004, which found positive evidence of lead contamination in the soil and water at the Metacon site. See Report, Pl. Ex. 9.  The report found soil lead concentrations on the firing range and berm ranging between 190 and 26,000

6

mg/kg.  Id. at 10.  The report concluded that: "All total lead
concentrations in soil samples collected from the backstop/berm
area and in all but one soil sample from locations between the
firing line and backstop/berm area exceed the CTDEP Direct
Exposure Criterion (DEC) for residential sites[3] (500 mg/kg).
Several of the sample concentrations exceed the CTDEP Significant
Environmental Hazard (SEH) notification threshold for residential
sites (15,000 mg/kg)." Id. at 10-11.  Additionally, AEI found
that the dissolved lead concentrations in the soil exceeded 0.015
mg/L and "[t]hus the lead is leachable and may over time pose a
threat to ground water quality." Id. at 11.

     AEI also tested wetland sediment samples, and concluded that
"[a]ll total lead concentrations in sediment samples exceed the
CTDEP Direct Exposure Criterion ... for residential sites (500
mg/kg). Id. at 11.  However, their engineer agreed with
defendants' expert that "dissolved lead in filtered samples [of
wetland surface water] was non-detect," even though the
unfiltered samples yielded lead concentrations from 0.016 to 0.42
mg/L, which exceeds the "CTDEP chronic aquatic life criterion of
0.0012 mg/L and some exceed the acute aquatic life criterion of
0.30 mg/L. Id. at 11-12.  AEI believed that "[b]ecause the
dissolved lead concentrations were non-detect, the total lead

---

     [3]It is undisputed that the Metacon site is zoned
residential, and that the recreational use of the gun club is
permitted in the residential zone.

concentrations are likely the result of either turbidity caused by suspended lead-bearing particles or colloidal matter." Id. at 12.

Ultimately, AEI concluded that the risk to humans and wildlife from the lead in the water and soil could not be assessed, because it depended on their "potential exposure" to the site. Id. at 13.

The parties dispute whether non-members are able to access the Metacon site. Gary Lenk, current president of Metacon, states:

> Public access to the Site is restricted by a number of methods: a fence and warning signs around the perimeter of the approximately 137 acre property; an approximately 650' to 700' high and 1/2 mile long cliff along the eastern boundary of the property; a chain link fence and card key access system for the range itself; 'No Trespassing/Private' signs posted at the entrance to the Site and to the outdoor range; and, internal rules that restrict access to the Metacon site to members and invited guests.

Lenk Aff. ¶ 11. On the other hand, plaintiffs Rinaldo Tedeschi and Greg Silpe state that they have been able to enter the Metacon site without impediment:

> ... The fence at Metacon does not extend around 137 acres of the Metacon Property. Rather, it is placed by the firing line. It does not prevent pedestrian access to the Site as persons can easily walk onto the parking lot and can walk around the chain link fence with key card access system and onto the firing line. When I was last on the Metacon Site I personally walked around the fence to get on the firing range.

Tedeschi Aff. ¶ 7; Silpe Aff. ¶ 7.

These two plaintiffs assert that they have been injured due to lead pollution at the Metacon site.  Silpe asserts: "I like to fish and would not fish near Metacon due to the lead contamination.  I no longer hike ridge line trails due to concerns for my safety from Metacon.  I am also disgusted when I look at the Metacon Site, knowing that it is a heavily polluted site."  Silpe Aff. ¶ 9.  Plaintiff Rinaldo Tedeschi asserts that he is "disgusted" by looking at Metacon.  Tedeschi Aff. ¶ 10.  SAPS asserts injury due to the injuries allegedly sustained by its members.[4]

## II.  Standing

The requirement that a plaintiff must have standing to bring a lawsuit is underpinned by the Article III case-or-controversy requirement, and therefore is jurisdictional.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc. ("Laidlaw"), 528 U.S. 167, 180 (2000).  At the summary judgment stage, the party asserting standing has the burden of proof.  Building & Construc. Trades Council of Buffalo v. Downtown Development, Inc., 448 F.3d 138, 145 (2d Cir. 2006).

To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in

---

[4]Plaintiffs assert that injury has been proved as to James Millozzi, who has stopped hiking in Talcott Park due to shooting from the Metacon range.  Millozzi Dep., Def. Ex. 29, at 33. Millozzi, however, is not a named plaintiff, and he was not sure whether he was a member of SAPS, although he has donated money to the organization.  See id. at 31-32

fact' that is (a) concrete and particularized and (b)
actual or imminent, not conjectural or hypothetical; (2)
the injury is fairly traceable to the challenged action
of the defendant; and (3) it is likely, as opposed to
merely speculative, that the injury will be redressed by
a favorable decision.

Laidlaw, 528 U.S. at 180-81 (quoting Lujan v. Defenders of
Wildlife, 504 U.S. 555, 560-61 (1992)).  "[E]nvironmental
plaintiffs adequately allege injury in fact when they aver that
they use the affected area and are persons 'for whom the
aesthetic and recreational values of the area will be lessened'
by the challenged activity."  Laidlaw, 528 U.S. at 183 (quoting
Sierra Club v. Morton, 405 U.S. 727, 735 (1972)).

### A.   Plaintiffs Gail March, Diane Tedeschi, Robert Patricelli and Sheldon Cherry

As a preliminary matter, four individual plaintiffs, Gail
March, Diane Tedeschi, Robert Patricelli and Sheldon Cherry, have
failed to submit any evidence (affidavits, depositions or other
materials) concerning injuries they may have incurred due to the
alleged pollution at defendants' site.  At the summary judgment
stage, these plaintiffs may not merely rest on the allegations of
the complaint.  See, e.g., Celotex Corp. v. Catrett, 477 U.S.
317, 324 (1986); Fed. R. Civ. P. 56(e) (a party opposing summary
judgment "may not rest upon the mere allegations or denials of
the adverse party's pleading.").  To prove standing in this case,
plaintiffs would have to proffer evidence "that they use the
affected area and are persons for whom the aesthetic and

10

recreational values of the area will be lessened by" Metacon's activities.  Laidlaw, 528 U.S. at 183 (internal quotation marks and citation omitted).  Without any evidence of these four plaintiffs' asserted injuries, they must be dismissed for lack of standing.

**B.   Plaintiff Gregory Silpe**

Plaintiff Gregory Silpe avers that he no longer hikes ridge trails in the neighboring Talcott Mountain State Park or fishes in the Farmington River due to his belief that these areas are contaminated by lead from Metacon.  Defendants argue that Silpe has "failed to show that lead from Metacon is in any off-site location, let alone on top of the mountain or along the mountain trails in the State Park," and that "Mr. Silpe has not offered any evidence that the river is polluted by lead – let alone lead from Metacon."  Def. Reply Mem. at 3, 4.  Therefore, defendant argues, Silpe has not been injured and cannot prove standing. This argument, however, confuses the standing inquiry with the merits inquiry.  As the Supreme Court held in Laidlaw, 528 U.S. at 181, "[t]he relevant showing for purposes of Article III standing ... is not injury to the environment but injury to the plaintiff."  Furthermore, Metacon's argument would require Silpe to prove that he has suffered physical harm from the lead, which is not the correct standard.  The Second Circuit has held that plaintiffs who allege injury due to "uncertainty" about the

effects of pollution by a facility subject to environmental permitting requirements have Article III standing.  N. Y. Public Interest Research Group v. Whitman, 321 F.3d 316, 325-26 (2d Cir. 2003) ("[T]he distinction between an alleged exposure to excess air pollution and uncertainty about exposure is one largely without a difference since both cause personal and economic harm. To the extent that this distinction is meaningful, it affects the extent, not the existence, of the injury.").  Silpe's fear and uncertainty that he could be harmed by lead pollution in the Farmington River and Talcott Mountain State Park, were he to resume fishing and hiking in these areas, is sufficient to confer standing.  See also Laidlaw, 528 U.S. at 182 (plaintiffs' "concer[n] that the water was polluted," together with testimony that they would like to use the river for recreational purposes, was sufficient to establish standing) (emphasis supplied).

Defendants, however, argue that Silpe's fear that bullets from Metacon may land in Talcott Mountain State Park is unreasonable and therefore cannot establish standing.  They rely on the statement in Laidlaw, 528 U.S. at 184, that the defendant in that case had "concededly" engaged in ongoing pollutant dumping in violation of its discharge permit, to argue that Silpe has not established standing because he has not established that lead on the Metacon site has actually made its way into Talcott State Park.  Defendants' argument again confuses the merits with

12

the standing inquiry.  Laidlaw did not hold that environmental plaintiffs only have standing if there is a proven or conceded violation of environmental laws.  Rather, the Supreme Court merely held that the plaintiffs in that case were reasonable to "curtail their recreational use of" the waterway and feel "economic and aesthetic harms" from mercury dumped in a river in their town.  Id. at 184-85.  Here, without determining the merit of the claim, it would be reasonable for Silpe to believe that bullets from the nearby site could land up on the ridge at Talcott Mountain State Park if misdirected above Metacon's berm, and could contaminate the park with lead.  It would be equally reasonable to believe that, if lead has contaminated the water and soil at Metacon, such lead might leach out into the Farmington River.  Evidence of a fear of such eventuality, provided in Silpe's affidavit, is sufficient to establish standing, even if the scientific evidence eventually may not support Silpe's concerns.

Finally, defendants argue that Silpe's injuries are not redressable by the present legal action because, even if Metacon is forced to remediate or cease operations, he still could be exposed to lead at the adjacent state police shooting range.  This argument is without merit.  Silpe's asserted injury in this case is harm from exposure to Metacon's lead, and requiring remediation of Metacon's lead would directly redress his asserted

harms.  The fact that he may suffer similar harm from a non-party
is irrelevant to his standing to sue this defendant.  If
anything, Metacon's argument goes to proximate causation of
damages, but not to standing.  For these reasons, Silpe has
established standing to sue Metacon for alleged lead pollution at
the Metacon site.

### C.   Plaintiff Rinaldo Tedeschi

Plaintiff Rinaldo Tedeschi, however, has submitted only
minimal evidence in an attempt to establish his standing in this
case.  He avers that he drives past the Metacon site "frequently"
and that he is "disgusted when [he] look[s] at the Metacon Site,
knowing that it is a heavily polluted site and that the Town is
doing nothing."  Tedeschi Aff. ¶¶ 7, 10.  Tedeschi does not state
that he actually sees spent munitions when he drives past
Metacon, only that he is generally disgusted by the thought of
the pollution that he believes exists there.  Although he states
that he can access the Metacon site by walking around the fence,
and has done so, Tedeschi Aff. ¶ 7, he fails to aver whether he
believes he has been exposed to lead from the water or soil at
Metacon.  He does not state whether he lives near the site,
whether he has used or would like to use the site or areas around
it for recreational purposes, whether he believes his property
values have been affected by the alleged pollution, or other such
"specific facts" as are necessary to establish standing.

14

See Lujan v. Defenders of Wildlife, 497 U.S. 871, 888 (1990)
(requiring "specific facts," not merely "conclusory allegations
of an affidavit," and holding that plaintiffs who alleged only in
general terms that their "aesthetic and recreational enjoyment"
of land in the vicinity of immense public tracts of land was
lessened failed to set forth sufficient specific facts to show
actual injury); compare Building & Construc. Trades Council of
Buffalo v. Downtown Devel., Inc., 448 F.3d 138, 146 (2d Cir.
2006) (holding that allegations that plaintiffs were exposed to
pollutants by working at contaminated site and drinking water
from public water supplies drawn from contaminated lake were
"sufficiently concrete" to allege injury-in-fact).  For this
reason, Tedeschi has failed to set forth sufficient facts
establishing an injury-in-fact for Article III standing purposes,
and he will be dismissed as a plaintiff in this case.

   **D.   Simsbury-Avon Preservation Society (SAPS)**

   "An association has standing to bring suit on behalf of its
members when its members would otherwise have standing to sue in
their own right, the interests at stake are germane to the
organization's purpose, and neither the claim asserted nor the
relief requested requires the participation of individual members
in the lawsuit."  Laidlaw, 528 U.S. at 181 (citing Hunt v. Wash.
State Apple Ad. Comm'n., 432 U.S. 333, 343 (1977)).  Because
individual plaintiff Greg Silpe has standing, SAPS has standing

pursuant to this rule.  Defendants do not challenge that the lawsuit is germane to the purpose of SAPS, which, as revealed in the briefing papers on the earlier motion to dismiss, was founded in order to challenge Metacon's environmental practices.[5]

Accordingly, the Court holds that SAPS and individual plaintiff Gregory Silpe have standing to bring this lawsuit, but the claims of plaintiffs Robert Patricelli, Rinaldo Tedeschi, Diane Tedeschi, Sheldon Cherry, and Gail March must be dismissed for lack of standing.

**III. RCRA Claims**

> **A.   Summary Judgment Standard**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Materiality is determined by the substantive law that governs the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In this inquiry, "[o]nly disputes over facts that might affect the

---

[5] In evaluating whether an organization's purpose is "germane," the Court "must determine whether an association's lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience."  Building & Construc. Trades Council, 448 F.3d at 149.

16

outcome of the suit under the governing law will properly
preclude the entry of summary judgment." Id. "Where the record
taken as a whole could not lead a rational trier of fact to find
for the nonmoving party, there is no genuine issue for trial."
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986).

In moving for summary judgment against a party who will bear
the ultimate burden of proof at trial, the movant's burden of
establishing that there is no genuine issue of material fact in
dispute will be satisfied if he or she can point to an absence of
evidence to support an essential element of the non-moving
party's claim. Celotex, 477 U.S. at 322-23. "A defendant need
not prove a negative when it moves for summary judgment on an
issue that the plaintiff must prove at trial. It need only point
to an absence of proof on plaintiff's part, and, at that point,
plaintiff must 'designate specific facts showing that there is a
genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc.,
260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at
324); see also Gallo v. Prudential Residential Servs., 22 F.3d
1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain
summary judgment by showing that little or no evidence may be
found in support of the nonmoving party's case.").

The non-moving party, in order to defeat summary judgment,
must then come forward with evidence that would be sufficient to

support a jury verdict in his or her favor.  <u>Anderson</u>, 477 U.S.
at 249 ("[T]here is no issue for trial unless there is sufficient
evidence favoring the nonmoving party for a jury to return a
verdict for that party").  In making this determination, the
Court draws all reasonable inferences in the light most favorable
to the party opposing the motion.  <u>Matsushita</u>, 475 U.S. at 587.
However, a party opposing summary judgment "may not rest upon the
mere allegations or denials of the adverse party's pleading,"
Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the
material facts" is insufficient.  <u>Id.</u> at 586 (citations omitted).

**B.   "Open Dumping" and "Imminent and Substantial Endangerment" Claims**

The first count of plaintiffs' complaint alleges "open
dumping" of lead on the Metacon site "and on property adjacent to
the Site" in violation of RCRA subchapter IV, 42 U.S.C. § 6945.
Am. Compl. ¶¶ 28-31.  Count Three alleges "imminent and
substantial endangerment ... to the wetlands, surface waters,
sediments, soils and biota at and near the Site" in violation of
RCRA subchapter VII, 42 U.S.C. § 6973.  Am. Compl. ¶ 43-45.

RCRA's complex statutory and regulatory scheme is discussed
in this Court's Ruling on the motion to dismiss.  <u>See</u> <u>Simsbury-</u>
<u>Avon Pres. Soc.</u>, 2005 WL 1413183, at *4.  For purposes of
"imminent hazard" and "open dumping" lawsuits, the broader RCRA
statutory definition of "solid waste" (as opposed to the narrower
regulatory definition that governs "hazardous waste" suits under

18

subchapter III, at issue in the motion to dismiss) governs.
Conn. Coastal Fishermen's Assoc. v. Remington Arms Co., 989 F.2d
1305, 1316 (2d Cir. 1993).  The statute defines solid waste as:
"any garbage, refuse, sludge from a waste treatment plant, water
supply treatment plant, or air pollution control facility and
other discarded material, including solid, liquid, semisolid, or
contained gaseous material resulting from industrial, commercial,
mining, and agricultural operations, and from community
activities..."  42 U.S.C. § 6903(27) (emphasis supplied).  Thus,
the "statutory definition contains the concept of 'discarded
material'... but it does not contain the terms 'abandoned' or
'disposed of' as required by the regulatory definition."  Conn.
Coastal, 989 F.2d at 1316.  As the Second Circuit observed,
"[t]he statute itself does not further define 'discarded
material'...."  Id. at 1314.

    In Connecticut Coastal, id. at 1316, the Second Circuit
deferred to the EPA's interpretation, set out in an amicus brief,
of "the statutory definition of solid waste as encompassing the
lead shot and clay targets" at a trap and skeet shooting club,
where the club conducted shooting over Long Island Sound and the
bullets and target fragments were deposited over the club's land
and in the Sound without any clean-up efforts being conducted.
"Without deciding how long materials must accumulate before they
become discarded – that is, when the shot is fired or at some

later time," the Court of Appeals "agree[d] that the lead shot and clay targets in Long Island Sound have accumulated long enough to be considered solid waste."   Id.

In 2001, after Connecticut Coastal was decided, EPA promulgated a manual entitled "Best Management Practices for Lead at Outdoor Shooting Ranges."   See Def. Ex. 1.   The manual discusses Connecticut Coastal and expresses a legal opinion that:

> [I]f lead shot and clay target debris are discarded (i.e. abandoned), these materials are considered a solid waste as defined in the statute and the facility may be subject to governmental or citizen suits.
>
> If, on the other hand, the discharged lead shot is recovered or reclaimed on a regular basis, no statutory solid waste (or hazardous waste) would be present and imminent hazard suits would be avoided.

Def. Ex. 1 at I-7.   Laying aside the question of whether the statutory definition of "discarded" should be construed to mean "abandoned" (a term utilized in the narrower regulatory definition of solid waste), a proposition not espoused in Connecticut Coastal, the EPA's manual expresses an opinion that, at some point, spent lead bullets become solid waste if not reclaimed and recycled.   Because the Court of Appeals in Connecticut Coastal accorded Chevron deference to this EPA interpretation, as this Court did in its Ruling on the motion to dismiss, See Simsbury-Avon Pres. Soc., 2005 WL 1413183, at *5, the EPA manual's application of the term "solid waste" will again be granted deference.

20

Metacon argues that its site contains no solid waste under the EPA's definition because its lead bullets are recovered and recycled. In support of this argument, it proffers the affidavit of Robert Ronstrom, a Metacon member, who states that over the past ten years he has "been involved in regular clean-ups of the range," during which "members of Metacon rake the range ... to collect ... spent casings and munitions," which are "containerized" and "taken from the Site by a lead recycler for recycling." Ronstrom Aff. ¶¶ 3-5. Ronstrom does not specify how often these clean-ups have occurred. Metacon President Gary Lenk also states that the club's new Environmental Stewardship Plan "provides for the periodic collection of lead from shooting, the periodic mining of the berm for lead...." Lenk Aff. ¶ 15. As stated in the Plan, the range is to be hand raked and sifted annually, beginning in Spring 2005 and continuing through Spring 2009. Def. Ex. 2 at Table 1, page 7. The berm is to be mined for lead in Fall 2024. Id.

Rinaldo Tedeschi attempts to controvert this testimony, stating that "when [he] visited the gun club, [he] saw [a] tremendous amount of spent ammunition on the ground...." Tedeschi Dep. at 68. Metacon argues, but offers no evidentiary support, that Tedeschi actually observed shell casings, not lead bullets. Regardless, his non-specific observation of a "tremendous amount" of debris does not contradict Ronstrom's

testimony that the members have, at some points in time over the past ten years, cleaned up the spent lead bullets from the range and sent them for recycling.

Metacon's Environmental Stewardship Plan does not prove that no RCRA violations have occurred at the site because the Plan was adopted after the complaint was filed in this case, and the first clean-up called for in the Plan was to take place in Spring 2005, a full year after the complaint was filed. Therefore, the Plan does not bear on the question of whether Metacon's practices at the time the complaint was filed constituted an imminent hazard to health or the environment or unlawful open dumping.

The uncontradicted statement of Ronstrom, however, indicates that even prior to the implementation of the Plan, Metacon members were engaged in "regular" clean-up and recycling of lead at the site. Accordingly, plaintiffs have not shown that the lead bullets that have landed on the Metacon site are "discarded" within the meaning of RCRA.

Plaintiffs argue that Metacon's members discharge lead bullets out of the site, and specifically that misdirected bullets may land on Talcott Mountain State Park or in the Farmington River or surrounding wetlands. However, plaintiffs have proffered no evidence suggesting the actual presence of lead bullets or bullet fragments off-site. There is no testimony from witnesses who have observed bullets in the Park, the river, or

22

adjacent wetlands or private property, for example.  Plaintiffs'
engineering expert tested for lead only in the soil, water and
wetlands on the Metacon site, not outside of it.  Lenk states
that "Metacon is unaware of any documentation that would show
that lead from Metacon's operations has ... landed off-site."
Lenk Aff. ¶ 19.

       Unlike the situation in Connecticut Coastal, where club
members engaged in aerial trap and skeet shooting above Long
Island Sound, which activity irretrievably scattered bullets and
clay fragments into the water, the uncontradicted evidence shows
no proof that Metacon's bullets have landed outside of its site.
Further, defendant's evidence shows that, for at least the past
ten years, its members have "regularly" cleaned up and recycled
the lead bullets from the site.  Contrary to plaintiffs'
argument, there is no genuine dispute of material fact as to
whether the lead at Metacon is discarded.  The lead bullets at
Metacon cannot be considered "solid waste" within RCRA's
statutory definition, and Metacon therefore is entitled to
summary judgment on plaintiffs' "open dumping" and "imminent
hazard" claim under RCRA subchapters IV and VII (Counts One and
Three).[6]

_____

       [6]Because the Court dismisses the RCRA claims on this basis,
it does not address defendant's apparently novel argument that
the RCRA claims are precluded by the Second Amendment.

**IV.   Conclusion**

Accordingly, defendant's motion to dismiss for lack of standing is GRANTED IN PART as to plaintiffs Robert Patricelli, Rinaldo Tedeschi, Diane Tedeschi, Sheldon Cheery and Gail March, who will be dismissed as parties to this case; and DENIED IN PART as to plaintiffs Gregory Silpe and the Simsbury-Avon Preservation Society.   Defendant's motion for summary judgment is GRANTED as to Counts One, Three and Five of the complaint.   Count Four, a different Clean Water Act claim, remains for trial.

IT IS SO ORDERED.

/s/
_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 1st day of August, 2006.**