UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SIMSBURY-AVON PRESERVATION | : |
| SOCIETY, LLC, et al., | : |
|     Plaintiffs, | : |
| | :   Civil No. 3:04cv803(JBA) |
| v. | : |
| | : |
| METACON GUN CLUB, INC., | : |
|     Defendant. | : |

RULING ON DEFENDANT'S SECOND MOTION
FOR SUMMARY JUDGMENT [DOC. #50]

Defendant Metacon Gun Club, Inc. ("Metacon") moves for summary judgment [Doc. #50] on the only remaining claim in the case, Count Four of plaintiffs' Amended Complaint [Doc. #12] based on § 402 of the Clean Water Act ("CWA"), 33 U.S.C. 1342. The issue presented is whether the lead shot at defendant's gun range is being discharged into "navigable waters" under the CWA in light of Rapanos v. United States, 126 S. Ct. 2208 (2006), which addresses the definition of "wetlands."  For the following reasons, defendant's motion for summary judgment will be GRANTED.

**I. Procedural/Factual Background and Legal Standard**

The remaining plaintiffs, Simsbury-Avon Preservation Society ("SAPS") "comprised of homeowners who live adjacent to and near the [Metacon] Site" and SAPS member Gregory Silpe, a resident of Simsbury, Connecticut, allege that defendant Metacon is violating CWA § 402 in the operation of its outdoor rifle and handgun range.  (See Am. Compl. [Doc. #12] at 3.)

1

A substantial part of the record on this summary judgment motion as well as the legal standard to be applied overlap with that in the defendant's first summary judgment motion [Doc. #41], familiarity with which is presumed.  See Simsbury-Avon Preservation Society v. Metacon Gun Club, No. 3:04cv803, 2006 WL 2223946 (D. Conn. Aug. 2, 2006).

Since the 1960s, Metacon has occupied 137 acres bordered by the Connecticut State Police pistol and rifle ranges to the north; Nod Road, the Farmington River, and forested public land to the west; a residence and golf course and golf course maintenance garage to the south; and a 650- to 700-foot cliff to the east.  (Pl. 56(a)(2) [Doc. #51-3] ¶ 3.)  The shooting range itself is 100 yards long and "backed up by an engineered earthen berm for bullet containment."  (Envtl. Plan, Def. Ex. 2, at 1.) Directly behind the berm is a vernal pond,[1] and Metacon admits that "wetlands border the range immediately to the North and

---

[1] The EPA defines "vernal pond," or "vernal pool" as follows:

> Seasonal pools, also known as vernal pools, temporary ponds, woodland pools, ephemeral wetlands, among other names, are isolated aquatic habitats that undergo periodic drying. Melting snow, run-off, and spring rains fill these small depressions to their maximum water levels in early spring ("vernal" is derived from the Latin word for spring). These same pools may completely dry out by late summer.

EPA — Vernal Pools, http://www.epa.gov/bioindicators/html/vernal_pools.html.

extend East beyond the berm for approximately 100 yards."   (Id.)

In 1987, Metacon sought approval from the Town of Simsbury
and from the Conservation Commission of the Inland Wetlands and
Watercourses Agency of the State of Connecticut ("CT Wetlands
Agency") to make improvements to the site.   (See Def. Ex. 35 viz.
at D8.)   The range was "included in the Nod Road aquifer area as
determined by the U.S. Geological Service," was "within the
Floodplain as defined by the Zoning Regulations . . . and the
Federal Emergency Management Agency," and "[t]he entire site
contain[ed] wetlands soils."   (Staye Letter, Def. Ex. 35, at D5.)
The CT Wetlands Agency approved Metacon's proposed construction
(see Def. Ex. 35 at D4), and in May 1989, the Simsbury Zoning
Commission also approved Metacon's application (Def. Ex. 35 at
D).   On January 29, 1990, Metacon was issued a Water Quality
Certificate from the State of Connecticut Department of
Environmental Protection ("CT DEP").   (See Def. Ex. 39.)   The
District Engineer approved Metacon on May 24, 1990 to fill
"[a]pproximately 0.03 of an acre of wetland" "to increase the
size of the berm."   (Def. Ex. 38.)

Metacon adopted an Environmental Stewardship Plan (the
"Plan") on July 13, 2004 (see Def. Ex. 2), which plans are
recommended by the EPA's Best Management Practices for Lead at
Outdoor Shooting Ranges ("EPA Manual") (see Def. Ex. 1).
Defendant's Plan "provides for the periodic collection of lead

3

from shooting, the periodic mining of the berm for lead, the periodic measurement of pH levels in soils at the Range and appropriate pH adjustments . . . and the application of fertilizer to soil . . . among other practices." (Pl. 56(a)(2) ¶ 10.) Metacon's range rules prohibit "shooting directed at aerial targets" (Pl. 56(a)(2) ¶ 18) and "use of the Range when rainfall has caused standing water to accumulate" (Pl. 56(a)(2) ¶ 22).

Three rounds of lead testing were performed at the Metacon site in 2003 and 2004.[2] The first testing was conducted by the CT DEP on October 23, 2003, disclosing levels exceeding "Connecticut's Remediation Standard Regulation protection criterion of 0.015 milligrams/liter concentration for the lead parameter in groundwater and surface water." (Laboratory reports, O'Connor letter, Def. Ex. 8.) However, the CT DEP Environmental Analyst admitted to the then Metacon President that the results "may have [been] skewed" by nonstandard sampling methods. (See O'Connor Letter, Def. Ex. 8.)

Metacon subsequently hired the environmental engineering firm of Leggette, Brashears & Graham, Inc. ("Leggette") to do the retesting on March 6, 10, and 15, 2004. (See Def. Ex. 7.) The report from Leggette notes that there was a "wetland area directly behind, or to the east of, the earthern [sic] berm."

---

[2] The Court does not consider the 1991-1992 tests performed by Newlands Sanitary Labortory, which are too dated to bear on the present analysis.

(<u>Id.</u>, Letter at 3.)   The firm's tests showed one sample with
"total lead above the ground-water protection criterion of 0.015
mg/l, but the dissolved lead in this sample was not detectable to
a method limit of 0.013 mg/l," and concluded "that the ground
water beneath the shooting range has not been impacted by lead
from the shooting range."   (<u>Id.</u>)   No surface water samples were
in excess of the 0.015 mg/L lead parameter for surface water.
(<u>Id.</u>, Table 1.)   The sampling also measured pH levels, which
ranged between 4.75 and 6.70 for the three wells.   (<u>Id.</u>, Leggette
low-flow sample logs.)   On April 23, 2004, Commissioner Arthur J.
Rocque, Jr. of the CT DEP wrote "that lead was not detected or
was present at concentrations in groundwater and surface water
below action levels."   (Def. Ex. 6 at 1.)

Plaintiffs hired Advanced Environmental Interface, Inc.
("AEI") to test soil, wetland surface water, and wetland sediment
on September 1, 2004.   (<u>See</u> Pls. Ex. 9.)   The AEI report does not
specify where the five wells for testing the "wetland surface
water" were located.   Total lead concentration levels for three
of the "unfiltered samples" exceeded the surface water lead
parameter, but "dissolved lead in filtered samples was non-
detect."   (<u>Id.</u> at Table 2.)   AEI opined that "[b]ecause the
dissolved lead concentrations were non-detect, the total lead
concentrations are likely the result of either turbidity caused
by suspended lead-bearing particles or colloidal matter" (<u>id.</u> at

12), but nonetheless that "[t]he presence of firing-range-related contaminants on the site, primarily total lead, represents a potential exposure risk to both humans and wildlife" (id. at 14). However, the AEI report also states that with respect to "impacted" soils, wetland surface water, and wetland sediments, "the degree of potential exposure cannot be assessed herein.  A risk assessment would need to be conducted to evaluate the potential exposure to both humans and wildlife."  (Id. at 12-13.)

## II. Discussion

Section 402 of the CWA establishes a National Pollutant Discharge Elimination System ("NPDES") according to which the Environmental Protection Agency ("EPA") may issue "permit[s] for the discharge of any pollutant" "into the navigable waters" of the United States.  See 33 U.S.C. § 1342(a)(1), (4).  The EPA, as the federal administrative agency responsible for implementation of the CWA, issues regulations, as well as interpretive documents like the EPA Manual claimed to be utilized by defendant Metacon. Working in conjunction with the EPA, the U.S. Army Corps of Engineers ("Army Corps") issues regulations and makes permitting decisions under the CWA in its exercise of jurisdiction over federal waters.  See, e.g., 33 C.F.R. § 320.4.

To be in violation of CWA § 402, an entity constituting or comprising a "point source" must "discharge a pollutant" into the "navigable waters" without an EPA permit.  Here, the parties

6

dispute whether Metacon has discharged "pollutants" and whether the topographical area into which the pollutants have allegedly been discharged qualifies as a "navigable water."

**A. "Pollutant"**

"The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6).  "Munitions" is among the pollutants listed but is not separately defined.  The CWA defines "discharge of a[ny] pollutant" as "any addition of any pollutant to navigable waters from any point source," with "point source" defined as "any discernible, confined and discrete conveyance" and "navigable waters" defined as "the waters of the United States."  33 U.S.C. §§ 1362(7), (12)(A), (14).  Defendant urges a distinction between fired, unrecovered munitions and shooting range munitions managed in accordance with the EPA Manual, citing Long Island Soundkeeper Fund, Inc. v. New York Athletic Club, No. 94 Civ. 0436 (RPP), 1996 WL 131863 (S.D.N.Y. Mar. 22, 1996), and Connecticut Coastal Fishermen's Association v. Remington Arms Co., 989 F.2d 1305 (2d Cir. 1993).

According to defendant, a munition is a pollutant only when it is fired into a water of the United States under New York

Athletic Club as discussed in the EPA Manual, to which agency interpretation the Court should defer in accordance with Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc., 467 U.S. 837 (1984).[3]  Further, defendant urges the Court to consider the meaning of "munitions" in the context of the other types of "pollutants" listed in 33 U.S.C. § 1362(6) "described as a waste," and since the bullets at Metacon are not discharged into water, they cannot constitute "pollutants."  (See Def. Mem. [Doc. #50-3] at 17-19.)

Plaintiffs counter defendant's view that lead shot is a "pollutant" under the CWA only when it is not recovered from water (see Pl. Opp. Mem. [Doc. #51-2] at 6), reading Remington Arms, New York Athletic Club, and the EPA manual as establishing that lead shot, as "munitions," is a pollutant within the meaning

_____

[3] Chevron has been read to mean that:

When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," . . . and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. . . .  But whether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered.

United States v. Mead Corp., 533 U.S. 218, 227 (2001) (citing Chevron, 467 U.S. at 843-844) (other citations omitted).

of the CWA (see id.), regardless of whether it is in water per se.

As "munitions" is expressly listed as a regulated "pollutant" under the CWA, and as "discharge of a pollutant" is inextricably tied to the determination of whether the destination of the pollutant is "navigable waters," further defined as "the waters of the United States," the relevant question framed by defendant's Motion for Summary Judgment is whether plaintiff's evidence can prove a CWA violation under an appropriate definition of "waters of the United States."  See 33 U.S.C. § 1362(6), (7), (12)(A).

**B. "Waters of the United States"**

Defendant argues it is entitled to summary judgment because the munitions are not being discharged into "waters of the United States" as required by 33 U.S.C. §§ 1362(7), (12)(A), as the Metacon site is not a covered wetland adjacent to the navigable waters of the Farmington River under Rapanos, 126 S. Ct. 2208. (See Def. Mem. at 19-23.)

Plaintiffs do not dispute defendant's reading that Rapanos requires a continuous surface water connection between the wetland and an adjacent, relatively permanent water of the United States.  (See Pl. Opp. Mem. at 8.)  Plaintiffs contend their evidence establishes that the vernal pool bordering the Metacon range is a wetland and that this pool "flows into Horsheshoe

9

Cove, which flows directly into the Farmington River, which is a permanent body of water," and thus summary judgment must be denied on their CWA § 402 claim.  (Id. at 8-9.)

The regulations of the Army Corps include within the term "waters of the United States" "[w]etlands adjacent to" "waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce traditionally within the definition."  33 C.F.R. § 328.3(a)(1), (7).  "Wetlands" are further defined as "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.  Wetlands generally include swamps, marshes, bogs, and similar areas."  33 C.F.R. § 328.3(b).  "Adjacent" is defined as "bordering, contiguous, or neighboring.  Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'"  33 C.F.R. § 328.3(c).

### 1. Holding of Rapanos

Rapanos involved two consolidated cases from Michigan in which the Sixth Circuit had affirmed the District Court's ruling that the four wetlands at issue, which lay "near ditches or man-made drains that eventually empt[ied] into traditional navigable

waters, constitute[d] 'waters of the United States' within the meaning of the [CWA]," Rapanos, 126 S. Ct. at 2219.

Justice Scalia's plurality opinion in Rapanos expressed concern with "sweeping assertions of jurisdiction over ephemeral channels and drains as 'tributaries,'" see 126 S. Ct. at 2216, 2217, reasoning that under Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers, 531 U.S. 159 (2001) ("SWANCC"), and United States v. Riverside Bayview Homes, Inc., 474 U.S. 121 (1985):

> . . . only those wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act. Wetlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States' do not implicate the boundary-drawing problem of Riverside Bayview, and thus lack the necessary connection to covered waters that we described as a 'significant nexus' in SWANCC. . . . Thus, establishing that wetlands . . . are covered by the Act requires two findings: First, that the adjacent channel contains a 'water of the United States,' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins.

Id. at 2226-27 (emphasis in original).

Justice Kennedy rejected this two-part test, concurring only in the plurality's decision to vacate and remand.  He expressed agreement with the requirement set out in SWANCC of "a significant nexus between the wetlands in question and navigable

waters in the traditional sense," id. at 2248, but read this
nexus differently:

> [W]etlands possess the requisite nexus, and thus come
> within the statutory phrase "navigable waters," if the
> wetlands, either alone or in combination with similarly
> situated lands in the region, significantly affect the
> chemical, physical, and biological integrity of other
> covered waters more readily understood as "navigable."
> When, in contrast, wetlands' effects on water quality
> are speculative or insubstantial, they fall outside the
> zone fairly encompassed by the statutory term
> "navigable waters."

Id. Justice Kennedy further opined that, while the Corps "may
rely on adjacency to establish its jurisdiction" over wetlands,
"the Corps must establish a significant nexus on a case-by-case
basis when it seeks to regulate wetlands based on adjacency to
nonnavigable tributaries."  Id. at 2249.

   The few courts attempting to apply Rapanos to date are not
in accord as to its holding: the Ninth and Seventh Circuits view
Justice Kennedy's concurrence as representing the fifth vote on
the narrowest common ground of decision, based on Marks v. United
States, 430 U.S. 188, 193 (1977): "When a fragmented Court
decides a case and no single rationale explaining the result
enjoys the assent of five Justices, 'the holding of the Court may
be viewed as that position taken by those Members who concurred
in the judgments on the narrowest grounds.'"  See N. Calif. River
Watch v. City of Healdsburg, 457 F.2d 1023 (9th Cir. 2006);
United States v. Gerke Excavating, 464 F.3d 723 (7th Cir. 2006).
The First Circuit follows the instruction of Justice Stevens, in

dissent, to find narrow overlap between the plurality and
concurrence on a case-by-case basis, see United States v.
Johnson, No. 05-1444, 2006 U.S. App. LEXIS 27042 (1st Cir. Oct.
31, 2006), and criticizes the other circuits' application of
Marks: "Curiously, without explanation, the [Gerke] court equates
the 'narrowest opinion' with the one least restrictive of federal
authority to regulate."  Johnson, 2006 U.S. App. LEXIS 27042, at
*14.  The First Circuit concludes that it is "just as plausible
to conclude that the narrowest ground of decision in Rapanos is
the ground most restrictive of government authority (the position
of the plurality), because that ground avoids the constitutional
issue of how far Congress can go in asserting jurisdiction under
the Commerce Clause," or "that the 'narrowest grounds' are simply
understood as the 'less far-reaching-common ground.'"  See id. at
*19.

Finding that the Marks "understanding of 'narrowest grounds'
. . . does not translate easily to the present situation,"
Johnson quotes Gerke's observation about the Rapanos dissenters:

> [Kennedy's] test is narrower (so far as reining in
> federal authority is concerned) than the plurality's in
> most cases, though not in all because Justice Kennedy
> also said that "by saying the Act covers wetlands
> (however remote) possessing a surface-water connection
> with a continuously flowing stream (however small), the
> plurality's reading would permit applications of the
> statute as far from traditional federal authority as
> are the waters it deems beyond the statute's reach."
>     Thus, any conclusion that Justice Kennedy reaches
> in favor of federal authority over wetlands in a future
> case will command the support of five Justices (himself

and the four dissenters), and in <u>most</u> cases in which he
concludes that there is no federal authority he will
command five votes (himself plus the four Justices in
the <u>Rapanos</u> plurality), the exception being a case in
which he would vote against federal authority only to
be outvoted 8-to-1 . . . because there was a slight
surface hydrological connection.  The plurality's
insistence that the issue of federal authority be
governed by strict rules will on occasion align the
Justices in the plurality with the <u>Rapanos</u> dissenters
when the balancing approach of Justice Kennedy favors
the landowner.  But that will be a rare case, so as a
practical matter the Kennedy concurrence is the least
common denominator (always, when his view favors
federal authority).

<u>Gerke</u>, 464 F.3d at 724-25 (internal citation omitted) (emphasis

in original).[4]  The First Circuit distills from these analyses a

"common sense approach to fragmented opinions" as requiring a

determination of the common ground supported by at least five

justices.  See <u>Johnson</u>, 2006 U.S. App. LEXIS 27042, at *23-24

(citing <u>inter alia</u> <u>Tyler v. Bethlehem Steel Corp.</u>, 958 F.2d 1176,

1182 (2d Cir. 1992) ("In essence, what we must do is find common

ground shared by five or more justices.")).

    While following the First Circuit's common-sense analysis

---

[4] Justice Stevens wrote:

I assume that Justice Kennedy's approach will be
controlling in most cases because it treats more of the
Nation's waters as within the Corps' jurisdiction, but
in the unlikely event that the plurality's test is met
but Justice Kennedy's is not, courts should also uphold
the Corps' jurisdiction.  In sum, in these and future
cases the United States may elect to prove jurisdiction
under either test.

<u>Rapanos</u>, 126 S. Ct. at 2265 n.14.

will usually arrive at the same reading of <u>Rapanos</u> as the Ninth and Seventh Circuits' <u>Marks</u>-based approach, this Court will consider under both the plurality's and Justice Kennedy's standards the issue of whether the plaintiffs have demonstrated a genuine factual dispute about whether Metacon munitions are being discharged into the waters of the United States.

### a. Plurality standard

This two-part standard was the only one briefed by the parties.  It requires that the wetland must: 1) be adjacent to a "relatively permanent body of water connected to traditional interstate navigable waters," and 2) have "a continuous surface connection with that water, making it difficult to determine whether the 'water' ends and the 'wetland' begins."  <u>See</u> <u>Rapanos</u>, 126 S. Ct. at 2227.

Before analyzing these two requirements, the Court considers whether the Metacon site is a "wetland" to which the <u>Rapanos</u> analysis is applicable.  Under the Army Corps definition, "wetlands" are "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. . . . generally includ[ing] swamps, marshes, bogs, and similar areas," 33 C.F.R. § 328.3(b).  Defendant admits that the Metacon range is in a "flood plain zone" that includes a

"vernal pond . . . located directly in back of the backstop berm," and is bordered by "wetlands" "immediately to the North" of the range and "extend[ing] East beyond the berm for approximately 100 yards."  (Def. Ex. 2 at 1.)  In a parallel state court case, the Superior Court for the Judicial District of Waterbury described Metacon as "located on and surrounded by wetlands and . . . part of an area designated a flood plain." (Def Ex. 9 at 1.)  Plaintiffs offer the 1987 zoning and CT Wetlands Agency documents (see Pls. Ex. 7), as well as to the affidavit of plaintiff Silpe (see Pls. Ex. 4) and the testimony of former plaintiff Tedeschi (see Pls. Ex. 2) to support the contention that the Metacon site is on wetlands.

Defendant argues that the Metacon range has not been classified as a federal wetland, which it views as a threshold requirement for CWA coverage.  It proffers the 1987 Corps of Engineers Wetlands Delineation Manual ("Corps Wetlands Manual"), which was designed for "use[] in the Clean Water Act Section 404 regulatory program for the identification and delineation of wetlands."  (Def. Ex. 43 at v.)  The Corps Wetlands Manual states that it "is limited in scope to wetlands that are a subset of 'waters of the United States' and thus subject to Section 404," and includes the definition of "waters of the United States" from 33 C.F.R. § 328.3.  Defendant proffers its expert Jeffrey Shamas, Senior Project Manager of the environmental consulting firm

16

Kleinfelder, Inc. in Windsor, Connecticut, who stated that the
delineation of federal wetlands in the 1989 Army Corps manual is
"not . . . sufficient, on its own, to establish the existence of
federal wetlands on the Metacon site," and that "no professional
soil scientist today would base a current federal wetlands
delineation solely on a 1989 federal wetland delineation" (Def.
Ex. 30 ¶¶ 6, 7).  It is difficult, however, to see the relevance
of this evidence in that the record offers no indication that a
federal agency made a determination that the Metacon site is a
"federal" wetland under the terms of the Corps Wetlands Manual,
although the site was classified as a wetland by local and state
agencies in 1989 (see Pls. Ex. 7).  Application of the term
"federal" to describe a wetland adds nothing to the analysis of
whether the wetland can be considered a navigable water for CWA
purposes.  The defendant's record fails to show that the site is
not a wetland and therefore the Court assumes for present
purposes that it is a wetland to which the Rapanos analysis is
relevant.

### i. Adjacency

Turning to the adjacency part of the Rapanos plurality
analysis, it is undisputed that the Farmington River is a "water
of the United States."  What is disputed is whether the claimed
wetlands of the Metacon range "border, [are] contiguous [with],
or neighboring" that river or a tributary thereof.  See 33 C.F.R.

17

§ 328.3(c).  The Army Corps regulation specifically states that
"adjacency" applies to "[w]etlands separated from other waters of
the United States by man-made dikes or barriers, natural river
berms, beach dunes and the like."  33 C.F.R. § 328.3(c).  It is
undisputed that the Farmington River at least "neighbors" the
claimed wetlands on Metacon property.

### ii. Continuous surface connection

Based on his personal experience and inquiry, Metacon Gun
Club Treasurer Michael Palmer stated that he has "found no
surface water connection by which rainwaters, flood waters, or
wetland waters on the Site flow directly from the Site to the
Farmington River" (Def. Ex. 31 ¶ 10).  Palmer also commented that
"the only way for the Plaintiffs to determine whether there is a
continuous, indirect surface water connection from the Site to
the Farmington River, without gaining formal site access from the
various site owners, would be to trespass behind two active
shooting ranges (Metacon's and the State Police's), and onto the
adjacent water company property" (id. ¶ 13).  Lenk further states
that "no shooting at Metacon range is directed into water," and
that "Metacon is unaware of any evidence that would show that
bullets from shooting at Metacon land in water." (Def. Ex. 11 ¶¶
22, 24.)

Plaintiffs dispute these contentions with Silpe's testimony,
based on his personal knowledge, that "[b]ehind the Metacon berm

is actual standing water" which "goes into what's called a horseshoe cove," "a waterway that's actually directly connected to the water that's behind the Metacon Gun Club" and that "eventually goes below Route 185 into the Farmington River." (Def. Ex. 24 at 95.)  The state Superior Court's observation that "the area is conducive to flooding, particularly during the spring when precipitation is greater"  (Def. Ex. 9 at 1) was confirmed by defendant's witness Llewellyn Rowe, Jr., a longtime user of the state police range located next to Metacon, who testified that the state "pistol range currently (as recently as October 2005) flood[s] . . . with an average rainstorm" (Def. Ex. 21 at 40-41).

Silpe also submitted six undated photographs of the range taken "from hiking trails which overlook the Metacon Gun Club. . . . depict[ing] what occurs after heavy rains and thawing of snow and ice. . . . [and] show[ing] a surface water connection between the Metacon Gun Club and horseshoe Cove, which flows into the Farmington River."  (Pl. Ex. 16 ¶ 3.)  In response, Lenk states: "In my years with Metacon, I have only observed flooding similar to that depicted in Mr. Silpe's photos on two occasions: one during the fall of 2005 and one during the spring of 2006.  The water levels and connections depicted in Mr. Sipe's photos are in no way typical of the normal condition of the Site and the area of the Site."  (Def. Ex. 44 ¶ 12.)  Lenk also attached his own

photos documenting the site "during a relatively wet period" (id. ¶ 7; id. at Photos B1, B2, B3), which sharply contrast with those offered by Silpe.

The Rapanos plurality specifies that "[w]etlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States' . . . lack the necessary connection" to be covered by the CWA.  See 126 S. Ct. at 2226. While plaintiffs have offered evidence showing that a surface water connection does at times exist, they offer no evidence demonstrating a continuous connection between the Metacon wetland and Horseshoe Cove or the Farmington River such that there exists "no clear demarcation between 'waters' and wetlands" as required by the plurality in Rapanos, 126 S.Ct. at 2226.  Therefore, the defendant is entitled to summary judgment under the plurality standard.

### b. Justice Kennedy's standard

Justice Kennedy's concurrence calls for application of a "substantial nexus" test to determine whether a wetland that is not clearly "adjacent to navigable-in-fact waters" should "come within the phrase 'navigable waters.'"  See Rapanos, 126 S. Ct. at 2248.  The test is satisfied "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as

20

'navigable.'"  Id.  The subject wetland is not covered, however, if its "effects on water quality are speculative or insubstantial."  Id.  While Justice Kennedy states that the "substantial nexus" test is "[c]onsistent with SWANCC and Riverside Bayview," id., the actual phrase "substantial nexus" does not appear in those opinions.  In Riverside Bayview, a semiaquatic marshy land adjacent to a navigable-in-fact water was held to be a "navigable water" for CWA purposes, while the seasonal ponds at issue in SWANCC were found not to possess the requisite nexus.  Thus, Justice Kennedy's test is fact-based, rather than categorical, recognizing "that wetlands can perform critical functions related to the integrity of other waters — functions such as pollutant trapping, flood control, and runoff storage."  See id. (citing 33 C.F.R. § 320.4(b)(2)).

It is undisputed that wetlands border the Metacon range to the north (Def. Ex. 2, at 1) and lie behind the berm (Leggette Letter, Def. Ex. 7), and that the Farmington River borders the site to the west (Pl. 56(a)(2) ¶ 3).  The record also shows that the range was subject to regulation by the CT Wetlands Agency in 1989 (see Pl. Ex. 7), and that the topography of the area is "conducive to flooding, particularly during the spring" (Def. Ex. 9 at 1; see also Pls. Ex. 4 ¶ 7, Pls. Ex. 16) or "with an average rainstorm" (Def. Ex. 21 at 40-41), suggesting, in the light most favorable to the plaintiffs, at least a periodic physical nexus

between the site and the navigable waters of the Farmington
River.

Because the parties assume that the <u>Rapanos</u> plurality is
controlling, they do not structure their arguments under Justice
Kennedy's substantial nexus test; however, both parties offer
data from testing on lead concentrations, that are relevant to
the Court's assessment of whether the Metacon wetlands affect the
"chemical, physical, and biological integrity" of the adjacent
Farmington River.[5]  As summarized <u>supra</u>, three rounds of testing
were performed on soil and/or water samples on the Metacon
property.  The 2003 CT DEP testing results indicating some
elevated concentrations of lead were admittedly flawed and of no
use to a fact-finder at trial.  The testing by the Leggette firm
in March 2004 which revealed one sample above the groundwater
protection criterion is similarly of little probative value to a
fact-finder, since Leggette concluded it showed no real impact on
the groundwater by the shooting range.  Thus, although the
Leggette testing disclosed pH levels conducive to migration of
lead through soil, these data had no probative value in the

---

[5] The Court is aware that "[t]he CWA . . . does not require
any showing that a pollutant has caused environmental damage to
enforce the NPDES permitting requirement," <u>New York Athletic
Club</u>, 1996 WL 131863, at *15, and only considers the data on lead
concentrations as relevant to whether the Metacon wetland could
affect the Farmington River's chemical, biological, or physical
integrity and thereby satisfy Justice Kennedy's substantial nexus
test.

absence of data showing lead contamination.

The AEI soil and surface water testing provides only water samples useful for comparative purposes, as the previous two rounds of testing did not evaluate soil samples. Plaintiffs emphasize that the AEI testing disclosed three unfiltered surface water samples in excess of the surface water lead parameter of 0.015 mg/L and that AEI concluded that there existed a danger of "potential exposure" to lead at the Metacon site. However, AEI explained that the high total lead concentrations were likely caused by turbidity or colloidal matter, and required a "risk assessment" of the potential exposure to humans and animals. Whether such a risk assessment would bear on the migratory possibilities of lead into the Farmington River is unknown because none was proffered.

Given the inconclusive evidence in the AEI report, notwithstanding the proximity of the Farmington River to the Metacon wetlands and the seasonal flooding of the area, the AEI data do not present more than "some metaphysical doubt" about defendant's claim of insubstantial nexus between the wetlands on defendant's property and the Farmington River. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Plaintiffs' inconclusive water sampling data cannot buttress the rest of plaintiffs' record so as to demonstrate that a rational trier of fact could find the required substantial nexus and thus

find for the plaintiffs on the record taken as a whole, Matsushita 475 U.S. at 586.  In short, there is insufficient evidence showing that "the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable,'" namely the Farmington.  See Rapanos 126 S. Ct. at 2248.  Instead, this is a case in which the "wetlands' effects on water quality are speculative or insubstantial, [thus] fall[ing] outside the zone fairly encompassed by the statutory term 'navigable waters.'"  Id.

**III. Conclusion**

As plaintiffs have failed to adequately rebut defendant's evidence that pollutants at its range are not being discharged into navigable waters in violation of CWA § 402, the Court GRANTS defendant Metacon's Motion for Summary Judgment [Doc. #50].  The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/

_____

JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 31st day of January, 2007.**

24